IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE OHIO NATIONAL LIFE INSURANCE COMPANY, et al., | : : : | Case No. 1:19-cv-00047-MRB |
| Plaintiffs, | : : : | Judge Barrett |
| v. | : : | |
| CETERA ADVISOR NETWORKS, LLC, et al., | : : : | |
| Defendants. | : : | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ENJOINING CETERA DEFENDANTS FROM PURSUING ARBITRATION AGAINST THEM**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs The Ohio National Life Insurance Company ("ONLIC") and Ohio National Life Assurance Corp. ("ONLAC") (collectively, "Plaintiffs") move the Court for a preliminary injunction enjoining Defendants Cetera Advisor Networks, LLC ("CAN"), First Allied Securities, Inc. ("FAS"), Cetera Investment Services, LLC ("CIS"), and Cetera Advisors, LLC ("CA") (collectively, the "Cetera FINRA Claimants") from: (1) taking any further action to pursue arbitration against Plaintiffs before the Financial Industry Regulatory Authority ("FINRA") with respect to the subject matters at issue in this case; and (2) from taking any further action as to Plaintiffs with respect to Cetera Advisors Networks, LLC and First Allied Securities, Inc., v. The O.N. Equity Sales Company, et al., FINRA Case No. 18-3987 (the "First FINRA Action"); and Cetera Investment Services LLC, et al. v. Ohio National Equities, Inc., et al., FINRA Case No. 18-3990 (the "Second FINRA Action").

The grounds supporting this motion are set forth in the attached Memorandum in Support and, to the extent deemed necessary, the evidence to be offered at an evidentiary hearing.

                                      Respectfully submitted,

                                      /s/ Marion H. Little, Jr.
                                      Marion H. Little, Jr.   (0042679)
                                      Trial Attorney
                                      Christopher J. Hogan   (0079829)
                                      ZEIGER, TIGGES & LITTLE LLP
                                      3500 Huntington Center
                                      41 South High Street
                                      Columbus, Ohio 43215
                                      (614) 365-9900
                                      (Fax) (614) 365-7900
                                      little@litohio.com
                                      hogan@litohio.com

                                      Attorneys for Plaintiffs

**MEMORANDUM IN SUPPORT**

**I.**          **INTRODUCTION**

Simply put, neither Defendants The Ohio National Life Insurance Company ("ONLIC") nor Ohio National Life Assurance Corp. ("ONLAC"), as *non-FINRA members*, are subject to an enforceable agreement to arbitrate any disputes with the Cetera FINRA Claimants—the threshold issue of arbitrability that must be resolved *by the Court*. That is true for at least three reasons.

*First*, the purported "Distribution Agreements" under which the Cetera FINRA Claimants assert that ONLIC and ONLAC have an obligation to arbitrate the claims asserted in the First and Second FINRA Actions do not cover, and thus, are *unrelated to the actual products and claims at issue in those Actions*. *Second*, as non-FINRA members, ONLIC and ONLAC have no obligation to arbitrate under FINRA rules, which mandate arbitration as to disputes *only* between FINRA members and/or FINRA members and individuals associated with FINRA members—i.e., registered representatives.

*Third*, even if the cited "Distribution Agreements" were applicable to the dispute, they do not impose an obligation to arbitrate on ONLIC and ONLAC because such agreements merely refer to arbitration "under" NASD (n/k/a) FINRA rules—rules that previously contemplated, but *no longer allow for*, arbitration involving non-FINRA member entities, such as ONLIC and ONLAC. Thus, the incorporated FINRA rules make clear that such language does not impose an enforceable obligation to arbitrate on ONLIC or ONLAC, as non-members, even if the distribution agreements applied. See, e.g., UBS Bank USA v. Hussein, 2014 U.S. Dist. LEXIS 56106, *9 (D. Utah, April 21, 2014) (court held that UBS Bank, a non-FINRA member affiliate of UBS, could not be compelled to arbitrate before FINRA—even if it was a party to a

1

contractual provision providing for arbitration under FINRA rules—because FINRA's rules <u>do not allow for jurisdiction over such a non-member</u>).

It is a fundamental principle of federal jurisprudence that the existence of a binding and enforceable agreement to arbitrate, which covers the subject dispute, is a necessary prerequisite to arbitration. Absent a valid and agreement to arbitrate, a party cannot be compelled to do so. <u>See</u>, e.g., <u>Mazera v. Varsity Ford Mgmt. Servs., LLC</u>, 565 F.3d 997, 1001 (6th Cir. 2009) ("The court must determine whether the dispute is arbitrable, meaning that a *valid agreement* to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement.") (emphasis added). Further, a party forced to arbitrate a claim or claims it did not agree to arbitrate is faced with *quintessential irreparable harm*. <u>See</u> <u>UBS Bank USA</u>, 2014 U.S. Dist. LEXIS 56106, at *11 (irreparable harm exists where party is "compelled to arbitrate a dispute that it did not agree to arbitrate").

Yet, that is precisely the case here, where the Cetera FINRA Claimants have filed the First and Second FINRA Actions in which they purport to assert claims against, *inter alia*, ONLIC and ONLAC that are not subject to or covered by an agreement to arbitrate. As a result, and to prevent the irreparable harm that would necessarily result if such entities are required to arbitrate claims they never agreed to arbitrate, the instant Motion should be granted. The Cetera FINRA Claimants should be enjoined from further pursuing arbitration against ONLIC and ONLAC, including as part of the First and Second FINRA Actions.

**II.**          **STATEMENT OF PERTINENT FACTS**

        **A.**     **Overview Of The Parties And The Cetera Selling Agreements At Issue.**

By way of background, ONLIC and ONLAC are insurance companies that, among other things, offer for sale various insurance-related products, including life insurance. [Exh. A, Declaration of Thomas DeGaetano ("DeGaetano Dec.").] Neither ONLIC nor ONLAC are

2

"members" or "associated persons" as defined in FINRA rules. [Id. ¶ 5; see also FINRA Rule 0160(b)(10) (defining "member" as an entity "admitted to membership in FINRA"), and FINRA Rule 13100(u) (noting that "persons associated with a member" are limited to "*natural persons*") (emphasis added).]

Previously, ONLIC offered and sold individual variable annuities—annuities that include assets maintained in securities sub-accounts. [DeGaetano Dec. ¶ 3] One such category of annuities—and the specific products are the heart of the Cetera FINRA Claimants' claims in the First and Second FINRA Actions—are the ONcore family of individual variable annuities, previously offered by ONLIC. [Id. ¶ 13] This ONcore line of products came with an optional Guaranteed Minimum Income Benefit ("GMIB Rider"). [Id.] The GMIB Rider was available *only* with respect to the ONcore line of individual variable annuities. [Id.]

In order to make their products available to a wide customer base, ONLIC and ONLAC, along with non-party Ohio National Equities, Inc. ("ONEQ"),[1] have historically entered into "selling agreements" with third-party broker-dealers unaffiliated with the Ohio National companies. Such broker-dealers include the CAN and FAS (and/or their predecessors), who are the Claimants in the First FINRA Action. [DeGaetano Dec. ¶ 4, Exh. A-1 (1999 selling agreement with Financial Network Investment Corp., predecessor to CAN); Exh. A-2 (1999 selling agreement with Walnut Street Securities, predecessor to CAN); Exh. A-3 (2006 selling agreement with Girard Securities, Inc., predecessor to CAN); Exh. A-4 (2000 selling agreement with FAS).] They also include CIS and CA, the Claimants in the Second FINRA Action. [Exh.

---

[1] ONEQ—a broker-dealer registered with FINRA—was made a party to the selling agreements for regulatory reasons. [DeGaetano Dec. ¶ 5.] That is because the selling agreements authorized the sale of variable products, which are regulated as securities. [Id.] However, the individual variable annuities (including GMIB ONcore annuities) were sold *by ONLIC*. [Id.] The premiums paid for purchase of such annuities went *to ONLIC*. [Id.] And, commissions owed to broker-dealers based on individual variable annuities, pursuant to the terms of the selling agreements, were paid *by ONLIC*. [Id.]

3

A-5 (2004 selling agreement with PrimeVest Financial Services, predecessor to CIS); Exh. A-6 (1988 selling agreement with Multi-Financial Securities Corp., predecessor to CA); Exh. A-7 (1998 selling agreement with Investors Capital Corp., predecessor to CA).]

These selling agreements previously authorized the contracting broker-dealers to offer and sell various products created by ONLIC, including ONcore individual variable annuities with a GMIB rider. [DeGaetano Dec. ¶ 13.] Indeed, it was these selling agreements, and *only these selling agreements*, that authorized each of the Cetera FINRA Claimants to sell ONcore products, including individual variable annuities. [Id. ¶ 13.]

*None of these selling agreements contain an arbitration provision*—let alone an arbitration provision applicable to ONLIC or ONLAC.

    **B.    The Cetera FINRA Claimants Assert Claims Against ONLIC And ONLAC Before FINRA That Are Based On And Related Solely To The Selling Agreements, Yet Their Purport To Seek Arbitration Against ONLIC And ONLAC Based On Separate "Distribution Agreements" That Have Nothing To Do With The At-Issue ONcore Individual Variable Annuities.**

Via their Statements of Claim filed in each of the two FINRA Actions, the Cetera FINRA Claimants seek relief against, *inter alia*, ONLIC and ONLAC based on an alleged contractual obligation to continue paying "trail" commissions on individual variable annuities, following the termination of the selling agreements in December 2018. [Exhs. A-8 and A-9, Statements of Claim, with exhibits, filed in First and Second FINRA Actions (collectively, the "FINRA SOCs").][2] That is relief that can only be based on and/or arise out of the above-described selling agreements, *which do not contain an arbitration provision*.

Specifically, in both the First and Second FINRA Actions, seek to recover ongoing trail commissions as to GMIB Annuities and other individual variable annuities sold via *the ONcore*

---

[2] In this case, ONLIC and ONLAC have asserted claims based on, and intend to pursue, substantive relief as to the meaning and application of the pertinent commission language in the selling agreements. The substantive meaning of the pertinent contractual language is not, however, pertinent to the instant Motion.

4

*commission schedule(s)*, attached to and incorporated in each of the selling agreements. This is made clear in both the references to GMIB annuities found throughout each statement of claim, and in the Cetera FINRA Claimants' specific attachment of and focus on the ONcore commission supplement *as the focus of their "trail" commission claims*. [See FINRA SOCs, at 5-6.] Thus, the Cetera FINRA Claimants' claims against ONLIC and ONLAC are, on their face, based on and relate *to the selling agreements*—agreements that afford the Cetera FINRA Claimants with no basis for compelling ONLIC and ONLAC to participate in FINRA arbitration.

Instead, in both the First and Second FINRA Actions, the Cetera FINRA Claimants cite and purport to invoke arbitration provisions contained in *separate* "Variable Contract Distribution Agreements" executed years ago by certain of their predecessors. [See Exh. A to each SOC ("Distribution Agreements").] Those provisions provided for arbitration of disputes arising out of or relating to the Distribution Agreements "*under the then applicable Code of Arbitration Procedure* of the National Association of Securities Dealers, Inc." [Distribution Agreements § 29 (emphasis added).]

But, the cited Distribution Agreements have nothing to do with the ONcore individual variable annuities that form the basis for the Cetera FINRA Claimants' requests for relief in their SOCs. [DeGaetano Dec. ¶ 15.] Indeed, a simple review of the agreements attached as Exhibit A to each statement of claim reveals that the ONcore commission schedule is neither an attachment to nor incorporated as part of either "Distribution Agreement." Rather, such agreements covered completely different products and services.

As a result, the "Distribution Agreements" the Cetera FINRA Claimants seek to invoke as the basis for compelling ONLIC and ONLAC to arbitrate before FINRA *have nothing to do with the actual claims asserted as part of the First and Second FINRA Arbitrations*.

**III.** **LAW AND ARGUMENT**

In considering a motion to enjoin an arbitration proceeding, courts apply the traditional equitable criteria for the granting of injunctive relief. Those factors are: (1) whether the movant has a substantial likelihood of success on the merits; (2) whether there is a threat of irreparable injury to the movant without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." Bd. of Educ. v. U.S. Dep't of Educ., 208 F. Supp. 3d 850, 860 (S.D. Ohio Sept. 26, 2016). Each of these elements is readily satisfied here.

**A.** **Plaintiffs Have A Strong Likelihood Of Success On The Merits.**

**1.** **The Existence Of An Enforceable Agreement Between The Parties To The Dispute Is A Threshold Question That Must Be Resolved By The Court.**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., governs arbitration disputes involving interstate commerce. Although the public policy embodied in the FAA favors arbitration in resolving disputes about the scope of an express agreement to arbitrate, above all:

> [A]rbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.
> [AT&T Tech. Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986).]

It is further clear that "whether or not a company is bound to arbitrate ... is a matter to be determined *by the Court*." Litton Fin. Printing Div. v. Nat'l Labor Relations Bd., 501 U.S. 190, 208 (1991) (emphasis added). See also AT&T Tech., 475 U.S. at 649 (determining whether a contract creates a duty to arbitrate a particular matter is an issue for the court to decide); United Steelworkers of America, etc. v. Timken Co., 717 F.2d 1008, 1012 (6th Cir. 1983) ("The question of arbitrability 'is for the courts to decide' only because it is necessary for the courts to decide,

6

when a party resists arbitration, whether the parties have agreed to submit the contested issue to an arbitrator for decision; this determination logically precedes the arbitration itself.").

Courts must, therefore, take care to ensure that a party is not forced to arbitrate a dispute that it has not agreed to arbitrate. Indeed, the first task of a court presented with a dispute regarding arbitrability is "to determine whether the parties *agreed to arbitrate that dispute*." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985) (emphasis added). As the Supreme Court recognized in Volt Info. Sciences, Inc. v. Stanford Univ., 489 U.S. 468, 469 (1989), "[a]rbitration under the act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit ... [and] they may limit by contract the issues which they will arbitrate."[3]

Only *if* the existence of a valid and enforceable agreement is established must a court then determine whether the particular dispute falls within the scope of that agreement. See Mazera v. Varsity Ford Mgmt. Servs., LLC, 565 F.3d 997, 1001 (6th Cir. 2009) ("The court must determine whether the dispute is arbitrable, meaning that a *valid agreement* to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement."); Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) ("A party who is seeking to compel arbitration must demonstrate 'that a *valid agreement* to arbitrate exists … and that the claim asserted comes within the clause's scope.'") (emphasis added); California Trucking Association v. Brotherhood of Teamsters, 679 F.2d 1275,

---

[3] Accord: First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995) ("Arbitration is simply a matter of contract between the parties; it is a way to resolve disputes — but only those disputes — the parties have agreed to submit to arbitration."); Bratt Enters. v. Noble Int'l Ltd., 338 F.3d 609, 612 (6th Cir. 2003) ("The duty to arbitrate a dispute derives from the parties' agreement and a party cannot be required to submit to arbitration *any dispute that the party has not agreed to so submit*") (emphasis added); Escobar-Noble v. Luxury Hotels Int'l of P.R., Inc., 680 F.3d 118, 121 (1st Cir. 2012) ("a court should not compel arbitration unless and until it determines that the parties entered into a validly formed and legally enforceable agreement covering the underlying claims(s)").

7

1280 (9th Cir. 1982) ("the existence and scope of a contract to arbitrate are questions for the court to determine in the first instance").

This rule applies with full force where parties seek to pursue and/or avoid arbitration before FINRA. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84-85 (2002), is on point. There, the Supreme Court held that determinations regarding application of mere *procedural* rules present "gateway" questions to be resolved by arbitrators. More importantly, the Court also recognized that disputes "about whether the parties are bound by a given arbitration clause … [and] whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" present questions of pure "arbitrability" that must be resolved by "*the court*." Id. (emphasis added)

### 2. The Existence Of A Valid And Enforceable Agreement To Arbitrate—As Opposed To The Scope Thereof—Is Not Subject To Any Type Of "Presumption" Favoring Arbitrability.

Courts often cite the general federal policy favoring arbitration, indeed a presumption, in determining whether a particular dispute falls "within the scope" of an express agreement to arbitrate. But let us be clear: This liberal federal policy simply has no bearing on a court's consideration of the threshold question of contract *existence*. To the contrary, the federal policy favoring arbitration is applied "only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was *validly formed and … is legally enforceable* and best construed to encompass the dispute." Granite Rock Co. v. Int'l Brotherhood. of Teamsters, 561 U.S. 287, 303 (2010) (emphasis added); see also Comer v. Micor, Inc., 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) (the federal policy favoring arbitration "is best understood as concerning 'the scope of arbitrable issues.'").

It is only *after* the existence of a valid arbitration agreement is established that a court will apply the federal policy in favor of arbitration. See, e.g., McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994) (holding that the "imperative" that the validity of an agreement to arbitrate be established first "is in no way inconsistent with the acknowledged 'federal policy favoring arbitration.' The federal policy presumes proof of a preexisting agreement to arbitrate disputes arising *between the protagonists*.") (emphasis added).

Thus, when the question presented is "not whether a particular issue is arbitrable, but whether a particular party is bound by the arbitration agreement ..., the liberal federal policy regarding the scope of arbitrable issues is inapposite." Comer, 436 F.3d at 1104 n.4 (emphasis added). "In short, the federal presumption in favor of arbitration cannot be used as a means of rewriting the arbitration clause to encompass a dispute that the parties did not intend for arbitration and that the contract does not anticipate." Smith v. Altisource Solutions., 726 Fed. Appx. 384, 390 (6th Cir. 2018). In other words, the "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead ordinary contract principles determine who is bound." Fleetwood Enterprises, Inc. v. Gaskamp, 280 F.3d 1069, 1073 (5th Cir. 2002) (quoted in Comer, 436 F.3d at 1104, n.11).[4]

### 3. There Is No Valid Agreement To Arbitrate Between The Cetera FINRA Claimants, On One Hand, And ONLIC And ONLAC, On The Other.

Applied here, these rules establish that no valid agreement to arbitrate before FINRA exists as to ONLIC and ONLAC, and thus, such entities are not only likely to prevail, but should

---

[4] See also California Fina Group, Inc. v. Herrin, 379 F.3d 311, 316 n.6 (5th Cir. 2004); Carson v. Giant Food, Inc., 175 F.3d 325, 329 (4th Cir. 1999) ("The general policy-based, federal presumption in favor of arbitration ... is not applied as a rule of contract interpretation ... ."); Dumais v. American Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002) ("The presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement; however, this presumption disappears when the parties dispute the existence of a valid arbitration agreement.").

prevail as a matter of law, on their claim that they have no obligation to arbitrate with the Cetera FINRA Claimants. That is true for multiple reasons.

      **a.    There Is No Agreement That Conceivably Imposes Any Obligation On ONLIC and ONLAC To Arbitrate The Claims Asserted By The Cetera FINRA Claimants.**

*First*, because the Cetera FINRA Claimants' claims are based on and arise out of the selling agreements, which do not contain an arbitration provision, there is no agreement to arbitrate for them to invoke. The Cetera FINRA Claimants' attempt to invoke the separate Distribution Agreements attached to their SOCs is simply a red herring, because the parties' dispute *has nothing to do with those agreements*. For that reason, alone, the Cetera FINRA Claimants cannot establish the existence of an enforceable agreement to arbitrate the subject disputes, and ONLIC and ONLAC are likely to succeed on their claim that no such agreement exists.

      **b.    ONLIC and ONLAC Are Not Required To Arbitrate Under FINRA Rules.**

*Second*, neither ONLIC nor ONLAC can be compelled to arbitrate under FINRA Rules. It is undisputed that ONLIC and ONLAC are neither FINRA members nor associated persons of a FINRA member. Hence, they cannot be compelled to arbitrate under the language of FINRA's industry code of arbitration procedure. In pertinent part, such code provides for arbitration only as to the following:

> [I]f the dispute arises out of the business activities of a [1] member or an associated person *and* [2] is between or among: [a] Members; [b] Members and Associated Persons or [c] Associated Persons.
>
> [FINRA Rule 13200(a) (brackets and emphasis added).]

10

On its face, Rule 13200 provides *only* for arbitration of disputes between, on the one hand, a member or associated person and, *on the other hand*, members and/or associated persons. Neither ONLIC nor ONLAC fall within the latter category. Thus, Rule 13200 plainly provides no basis for requiring ONLIC and ONLAC to arbitrate the Cetera FINRA Claimants' claims against them before FINRA. *Indeed, in another action recently filed by a registered representative who claims to have been previously affiliated with FAS, FINRA has specifically acknowledged that neither ONLIC nor ONLAC, as non-members, are required to arbitrate before FINRA*. [Exh. A-10, copy of Jan. 18, 2019 letters from FINRA in Vandyke, et al. v. The O.N. Equity Sales Company, et al., FINRA Case No. 19-00228.]

        **c.    Because It Provides For Arbitration Solely "Under" FINRA Rules, The Arbitration Provision In The Distribution Agreements—Even If It Applied To The Subject Dispute— Imposes No Valid Or Enforceable Obligation To Arbitrate On ONLIC And ONLAC.**

*Third*, even if the pre-dispute arbitration provisions contained in the "Distribution Agreements" were otherwise applicable (they are not), there is still no agreement to arbitrate the subject dispute between the Cetera FINRA Claimants and ONLIC and ONLAC. That is because such provisions merely refer to arbitration "under" NASD n/k/a FINRA rules. The FINRA rules in effect at the time the parties' dispute arose *do not even contemplate arbitration by non-members like ONLIC and ONLAC*.

Specifically, as noted above, the current FINRA industry code does not provide for, and thus FINRA lacks jurisdiction over, industry claims against non-members and/or non-associated persons. Therefore, even if otherwise applicable, the arbitration provisions found in the Distribution Agreements are neither valid nor enforceable agreements by ONLIC or ONLAC to arbitrate any claims before FINRA.

11

UBS Bank, *supra*, is on point. There, a FINRA customer claimant sought to force a non-FINRA member affiliate of UBS Financial Services, a broker-dealer, to arbitrate before FINRA under the terms of a _pre-dispute_ Client Relationship Agreement ("CRA"). UBS Bank, 2014 U.S. Dist. LEXIS, at *1-4. The contract provision at issue indicated that FINRA was the sole forum in which arbitration could be conducted and further noted that the parties were giving up the right to sue "except as provided by the rules of the arbitration forum in which a claim is filed." Id. at *3-4.

Assuming that UBS Bank was subject to the pertinent agreement, the court cited the language referring to application of the rules of the arbitration forum and held that such entity could not be compelled to participate in FINRA arbitration, absent _post-dispute_ consent to do so, based on the FINRA customer code—which (as described below) imposes _less-restrictive_ requirements for arbitrability than the industry code. It so held because:

> [E]ven if UBS Bank were a party to the CRA, UBS Bank would still not be obligated to arbitrate Hussein's claims before FINRA. … Hussein chose FINRA as the forum governing his arbitration claim _and FINRA's rules do not allow it to arbitrate claims against UBS Bank without UBS Bank's consent_.
>
> \*     \*     \*
>
> … UBS Bank cannot be compelled to arbitrate Hussein's claims against UBS Bank because the CRA arbitration provision _clearly states that the rules of the arbitration forum where the claim is filed govern. Hussein filed his arbitration claim with FINRA, and FINRA's rules do not allow jurisdiction over UBS Bank_.
>
> \*     \*     \*
>
> … Even if UBS Bank were a party to the CRA, UBS Bank cannot be compelled to arbitrate Hussein's claims because the FINRA forum where Hussein filed his claims does not have jurisdiction over UBS Bank, and UBS Bank did not consent to FINRA's jurisdiction. …
>
> [Id. at *8-9 (emphasis added).]

12

So, too, here. Even if the Distribution Agreements actually applied to the parties' dispute, they provide only for arbitration "under" FINRA rules. FINRA rules do not even contemplate arbitration by non-members in industry disputes. As a result, the plain language of the cited, pre-dispute contractual provision—in expressly incorporating FINRA rules—imposes no obligation on ONLIC or ONLAC to arbitrate any claims before FINRA.

    **d. A Comparison Of The Prior NASD Rule With *Current* FINRA Rule 13200(a) Emphasizes The *Current* Lack Of FINRA Jurisdiction Over Non-Members Like ONLIC And ONLAC.**

The result attained in UBS Bank, and which should attain here even if the Distribution Agreements somehow apply, is confirmed by a review of historical changes in the pertinent NASD/FINRA Rules, and by a comparison of the current FINRA Industry Rule with the analogous provisions applicable to customer disputes. *First*, that FINRA *currently* lacks jurisdiction over non-FINRA members in industry disputes is emphasized by a comparison of current Rule 13200(a) with former NASD Rule 10201(a), which was in effect until at least 2007.

Former NASD Rule 10201(a), *unlike current FINRA Rule 13200(a)*, provided for arbitration by "certain others." The former rule was, thus, not limited to disputes solely between and among members and/or associated persons. The following comparison highlights the key differences in the pertinent rule between then and now (with emphasis added):

| **Former NASD Rule 10201(a)** | **FINRA Rule 13200(a) Currently In Effect** |
|---|---|
| 10201. Required Submission<br><br>(a) Except as provided in paragraph (b) or Rule 10216 [both of which relate to statutory discrimination claims], a dispute, claim, or controversy eligible for submission under the Rule 10100 Series between or among members and/or associated persons, ***and/or certain others***, arising in connection with the business of such member(s) or in connection with the activities | 13200. Required Arbitration<br><br>(a) Generally<br><br>  Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute *arises out of the business activities of a member* or an |

13

| | |
|---|---|
| of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the instance of: (1) a member against another member; (2) a member against a person associated with a member or a person associated with a member against a member; and (3) a person associated with a member against a person associated with a member. | associated person and is **_between or among_**:<br><br>• _Members;_<br><br>• _Members and Associated Persons; or_<br><br>• _Associated Persons._ |

Simply put, arbitration by "certain others" is no longer contemplated by the industry code. Rather, _only_ disputes between and among FINRA members and associated persons are subject to arbitration before FINRA.

_Second_, a comparison of current Rule 13200(a) with FINRA's current customer arbitration code reveals a key difference that further emphasizes FINRA's lack of jurisdiction over non-members in industry disputes. Specifically, current FINRA Rule 12201 provides for "Elective Arbitration" in _customer_ disputes. It states that:

> Parties may arbitrate a dispute under the Code if:
>
> • The parties _agree in writing_ to submit the dispute to arbitration under the Code _**after the dispute arises**_; and
>
> • The dispute is between a customer and a member, associated person of a member, **_or other related party_**; and
>
> • The dispute arises in connection with the business activities of a member or an associated person, except disputes involving the insurance business activities of a member that is also an insurance company.
>
> [Emphasis added.]

At bottom, this is not a customer dispute. And, thus, unlike the former NASD Industry Code, there is no provision for, and thus, no FINRA jurisdiction over claims asserted against non-FINRA members like ONLIC and ONLAC. For this additional reason, even if the

14

Distribution Agreements applied, they do not establish an enforceable agreement to arbitrate as against ONLIC and ONLAC.

### B. ONLIC And ONLAC Will Suffer Irreparable Harm If Forced To Arbitrate A Dispute They Have Not Agreed To Arbitrate, And The Cetera FINRA Claimants Can Show No Countervailing Hardship.

Courts have clearly spoken that a party is caused irreparable harm if it is forced to arbitrate a dispute where it had no contractual obligation to do so. See LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distribution, Teamsters Local 63, 849 F.2d 1236, 1241 n.3 (9th Cir. 1988) (holding that party was entitled to injunctive relief once it established that it was not under a contractual duty to arbitrate). Accord: Merrill Lynch Investment Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2nd Cir. 2003) (unless arbitration is enjoined, movant would suffer irreparable harm by being forced to expend time and resources arbitrating an issue that is not arbitrable and as to which any award would not be enforceable); MONY Sec., Inc. v. Vasquez, 238 F. Supp. 2d 1304, 1308 (M.D. Fla. 2002) ("This Court has continuously held that irreparable harm is present if a party is compelled to arbitrate a claim absent an agreement between the parties to arbitrate).[5] Stated simply, irreparable harm *per se*

---

[5] This is not a novel proposition. Federal courts across the country have recognized that a party suffers quintessential irreparable harm where it is forced to arbitrate a dispute that it never agreed to arbitrate. See, e.g., UBS Sec. LLC v. Voegeli, 405 Fed. Appx. 550, 552 (2nd Cir. 2011). ("Being forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm for which there is no adequate remedy at law. … Because UBS is not legally obligated to arbitrate the Swiss Investors' claims, and the lack of an injunction would result in UBS effectively being required to do so, UBS satisfies the 'irreparable harm' and 'lack of adequate remedy at law' requirements for an injunction."); Morgan Keegan & Co. v. Louise Silverman Trust, 2012 U.S. Dist. LEXIS 3870, *18 (D. Md. Jan. 12, 2012) ("[T]he harm suffered by an [entity] who is forced to arbitrate claims it did not agree to arbitrate is *per se irreparable* because it forces an individual to expend resources it cannot later recover.") (emphasis added); McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P., 105 F.3d 1192, 1194 (8th Cir. 1997) (observing that courts "uniformly hold that the party urging arbitration may be enjoined from pursuing what would now be a futile arbitration, even if the threatened irreparable injury to the other party is only the cost of defending the arbitration and having the court set aside any unfavorable award."); Meduri Farms, Inc. v. Dutchtecsource B.V., 2017 U.S. Dist. LEXIS 199793, *36 (D. Or. Dec. 5, 2017) ("[C]ourts … have held that '[f]orcing a party to submit to arbitration, when it did not agree to do so, constitutes per se irreparable harm' … The Court agrees with these courts and finds that [Plaintiff] likely would suffer irreparable harm if it were forced to submit to arbitration when it did not agree to do so."); UBS Fin. Servs. Inc. v. Bounty Gain Enters., Inc., 2015 U.S. Dist. LEXIS 180725, *2-3 (S.D. Fla. Nov. 19, 2015) ("Plaintiff has clearly shown that [Defendant's] claim is not arbitrable against [Plaintiff]

15

exists where a party is "compelled to arbitrate a dispute that it did not agree to arbitrate." UBS Bank, 2014 U.S. Dist. LEXIS 56106, at *11.

In light of this law, the balance of hardships tips *completely* in Plaintiffs' favor, because if the Cetera FINRA Claimants have no right to proceed with arbitration against ONLIC and ONLAC, they will suffer no hardship at all by having to litigate their disputes with Plaintiffs in court like every other litigant who lacks an agreement to arbitrate.

### C. The Public Interest Is Advanced By Not Forcing Parties To Arbitrate Disputes They Have Not Agreed To Arbitrate.

Although it is often said that public policy favors arbitration of disputes, that is true only if the parties have agreed to arbitrate in the first instance. Arbitration is a creature of contract, and if the parties do not have a valid and enforceable agreement to arbitrate their disputes, then no public interest is advanced by compelling them to arbitrate.

Indeed, "[i]t is self-evident that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' … The public interest is not advanced when that party did not agree to submit to arbitration. Here, a preliminary injunction will serve the public interest by minimizing the risk [ONLIC and ONLAC] will suffer through the inconvenience and cost associated with arbitration disputes[.]" UBS Bank, 2014 U.S. Dist. LEXIS 56106, at *11-12.

In sum, where courts find that no agreement to arbitrate exists, they do not linger on this factor for even a moment because the public interest is obviously served when parties are not forced to arbitrate disputes that they never agreed to arbitrate.

---

because [Defendant] was never a customer of [Plaintiff] or an associated person of [Plaintiff], and consequently that irreparable injury will be suffered unless the injunction issues.").

**IV.**                                   **CONCLUSION**

For all of these reasons, ONLIC and ONLAC are entitled to a preliminary injunction enjoining the Cetera FINRA Claimants from: (1) taking any further action to pursue arbitration against ONLIC and ONLAC before FINRA with respect to the subject matters at issue in this case; and (2) from taking any further action as to ONLIC and ONLAC with respect to the First and Second FINRA Actions. The instant Motion should be granted.

                                                 Respectfully submitted,

                                                 /s/ Marion H. Little, Jr.
                                                 Marion H. Little, Jr. (0042679)
                                                 Trial Attorney
                                                 Christopher J. Hogan (0079829)
                                                 ZEIGER, TIGGES & LITTLE LLP
                                                 3500 Huntington Center
                                                 41 South High Street
                                                 Columbus, Ohio 43215
                                                 (614) 365-9900
                                                 (Fax) (614) 365-7900
                                                 little@litohio.com
                                                 hogan@litohio.com

                                                 Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

  I hereby certify that on this 15th day of March, 2019, I electronically filed the foregoing using the CM/ECF system, which will service the following counsel of record:

Andrew J. Dorman, Esq.
Brian P. Nally, Esq.
REMINGER CO., L.P.A.
101 W. Propsect Avenue, Suite 1400
Cleveland, Ohio 44115
ADorman@Reminger.com
BNally@Reminger.com

Luigi Spadafora, Esq.
Matthew Tracy, Esq.
WINGET, SPADAFORA & SCHWARTZBERG, LLP
45 Broadway, 32nd Floor
New York, New York 10006
Spadafora.l@wssllp.com
Tracy.m@wssllp.com

Attorneys for Defendants
Cetera Advisor Networks, LLC, First Allied Securities, Inc., Cetera Investment Services LLC, Cetera Advisors LLC, Summit Brokerage Services, Inc. and
Cetera Financial Specialists LLC

Robert J. Gehring, Esq.
Edward M. O'Connell, Jr.
Christen M. Steimle
BUECHNER HAFFER MEYERS & KOENIG CO., LPA
Atrium Two, Suite 2300
221 East Fourth Street
Cincinnati, Ohio 45202
rgehring@bhmklaw.com
eoconnell@bhmklaw.com
csteimle@bhmklaw.com

Attorneys for Defendants
Oppenheimer & Co., Inc. and
Oppenheimer Life Agency, LTD

            /s/ Marion H. Little, Jr.
            Marion H. Little, Jr. (0042679)

414-033:801501