# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**THE OHIO NATIONAL LIFE INSURANCE COMPANY, et al.,**[1]

    **Plaintiffs-Counter Defendants,**

    v.

**CETERA ADVISOR NETWORKS, LLC, et al.,**[2]

    **Defendants-Counter Plaintiffs.**

Case No. 1:19-cv-47

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

This breach of contract action is currently before the Court on (1) Oppenheimer's Motion for Judgment on the Pleadings (Doc. 25); (2) Ohio National's Motion for Judgment on the Pleadings (Doc. 37); and (3) Ohio National's Amended Motion for Judgment on the Pleadings (Doc. 59). Each party argues that the contract unambiguously supports that party's view of this case. For the reasons discussed more fully below, the Court determines that both parties have advanced a plausible reading of the contract at issue, meaning that the contract does not unambiguously compel judgment for either side. Accordingly, the Court **DENIES** Oppenheimer's Motion for Judgment on the Pleadings (Doc. 25); **DENIES** Ohio National's Amended

---

[1] The Court refers to the Plaintiffs in this case—The Ohio National Life Insurance Company and Ohio National Life Assurance Corporation—as Ohio National throughout this Opinion.

[2] The Court refers to the remaining Defendants in this case as Oppenheimer. Those Defendants are Oppenheimer & Co., Inc. and Oppenheimer Life Agency. Prior defendants, known throughout this litigation as the Cetera Defendants, dropped out of this lawsuit pursuant to a Stipulation of Partial Dismissal With Prejudice that Ohio National filed on December 28, 2020.

Motion for Judgment on the Pleadings (Doc. 59); and **DENIES AS MOOT** Ohio National's Motion for Judgment on the Pleadings (Doc. 37).[3]

## BACKGROUND

Ohio National is an insurance company that issues various insurance-related products. Among those products are individual variable annuities, including the kind at issue here—"ONcore Variable Annuities." (Compl., Doc. 1, #4). Ohio National sells these annuities by entering into selling agreements with broker-dealers, like Oppenheimer, who in turn sell the annuities to individual customers.

The parties' dispute began when Ohio National sent Oppenheimer a letter notifying Oppenheimer that Ohio National was terminating the selling agreement it had entered into with Oppenheimer. The parties do not contest that this termination was without cause.

As relevant here, that selling agreement governed the terms and conditions under which Oppenheimer would receive commissions for selling various Ohio National financial products, including ONcore Variable Annuities. Oppenheimer argues that Ohio Nationals still owes Oppenheimer "trail commissions" for the ONcore Variable Annuities that Oppenheimer sold to investors. Trail commissions are commissions that Ohio National pays on a periodic basis to the broker-dealer of record—here, Oppenheimer—based on the value of the annuity, so long as the annuity stays in effect.

---

[3] Ohio National's original Motion for Judgment on the Pleadings (Doc. 37) is now moot because Ohio National replaced that motion with its subsequently filed Amended Motion for Judgment on the Pleadings (Doc. 59).

Consistent with this matter being before the Court on motions for judgment on the pleadings, both sides rely exclusively on provisions of the selling agreement to support their positions. Oppenheimer points to language in Section 9 of the selling agreement. That language states (in part) that:

> *[t]he terms of compensation shall survive this Agreement unless the Agreement is terminated for cause* by ONL [Ohio National] provided that BD [Oppenheimer] remains a broker-dealer in good standing with the NASD and other state and federal regulatory agencies and that BD remains the broker-dealer of record for the account.

(Selling Agreement, Doc. 1-10, #194) (emphasis added). The Court will refer to this language as the "Survival Provision" throughout this Opinion.

Ohio National, for its part, directs the Court to a different provision. That provision is located in the schedule of commissions for ONcore Variable Annuities that is attached to the selling agreement. The Court will refer to it as the "In Force Provision." It states that trail commissions:

> will continue to be paid to broker dealer of record *while the Selling Agreement remains in force* and will be paid on a particular contract until the contract is surrendered or annuitized.

(Schedules of Commissions, Doc. 1-10, #202) (emphasis added).

Thus, the issue before the Court is one of contract interpretation, and the parties agree that Ohio law controls the substance of that decision.

**LEGAL STANDARD**

On cross motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), a court's task varies slightly depending on whose motion the court is reviewing. When a *defendant* moves for judgment on the pleadings, the court must

3

construe the complaint in the light most favorable to the plaintiff and accept the well-pleaded factual allegations as true. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). The court's task is thus much like reviewing a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

When the *plaintiff* moves for judgment on the pleadings, by contrast, "the motion should be granted if, on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law." *Lowden v. Cnty. of Clare*, 709 F. Supp. 2d 540, 546 (E.D. Mich. 2010) (citing *United States v. Blumenthal*, 315 F.3d 351 (3rd Cir. 1963) and *Hous. Auth. Risk Retention Grp., Inc. v. Chicago Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004)); *accord Starnes Family Office, LLC v. McCullar*, Nos. 10-2186, 11-2262, 2011 WL 3862333, at *4 (W.D. Tenn. Sept. 1, 2011). Thus, when reviewing a plaintiff's motion for judgment on the pleadings, the court does not just determine the legal sufficiency of the plaintiff's factual allegations as it does when reviewing a Rule 12(b)(6) motion to dismiss. Rather, the Court also looks to the factual allegations in the defendant's answer and determines whether, "on the undenied facts alleged in the complaint … the plaintiff is entitled to judgment as a matter of law." *Lowden*, 709 F. Supp. 2d at 546.

Here, both the plaintiff and the defendant moved for judgment on the pleadings, and the Court applies the relevant standard when reviewing each motion. But, functionally, the Court's inquiry is the same under either motion. That is because the sole source of the parties' disagreement is the meaning of their contract.

And both parties argue that the contract's meaning can be ascertained from the document itself, making the interpretive question a matter of law, rather than fact. That is the question to which the Court now turns.

**LAW AND ANALYSIS**

Some general principles of contract interpretation under Ohio law bear on the parties' dispute. "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse v. Franklin Cnty. Convention Facilities Auth.*, 672 N.E.2d 519, 526 (Ohio 2002). The first place a court should look in furtherance of that purpose is the contract's plain language. *Id.*; *see also Hamilton Serv. v. Nationwide Ins. Cos.*, 714 N.E.2d 898, 900 (Ohio 1999). In doing so, a court must not read selected terms in isolation from one another. Rather, a court must read the contract "as a whole." *Foster Wheeler Enviresponse*, 678 N.E.2d at 526. If a particular construction would render a term in a contract meaningless, "and it is possible to give" the condition "another construction that would give it meaning and purpose," then that is the construction the court should apply. *Id.* Moreover, if, after applying those rules, a contract is clear and unambiguous, the Court ends its analysis and applies the clear language without resort to any extrinsic information. *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). Conversely, if a contract as written is unclear or ambiguous, the court may consider extrinsic information "in an effort to give effect to the parties' intentions." *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992).

The parties agree on these principles. Indeed, both parties cite these principles and marshal them in support of their respective positions. But the parties disagree on the *application* of these principles to the contract here. Each party says that the contract unambiguously means what they say it means and unambiguously does not mean what the other side says it means. Put another way: Oppenheimer argues that, because Ohio National terminated the selling agreement without cause, the selling agreement unambiguously prohibits Ohio National from withholding trail commissions. Ohio National, by contrast, argues that the selling agreement unambiguously provides that it may do exactly that.

In contract disputes, as in life, the truth often lies somewhere in the middle. That is the case here. Both sides have identified contractual language that supports their preferred—and yet diametrically opposed—interpretations. But precisely *because* they can do so, the Court cannot agree that the contract *unambiguously* supports either position. To have any hope of divining the parties' intentions in the face of the conflicting contractual language, the Court would need to consider extrinsic evidence.

Start with Oppenheimer's preferred interpretation. As noted above, Oppenheimer latches on to the Survival Provision, which states:

> *[t]he terms of compensation shall survive this Agreement unless the Agreement is terminated for cause* by ONL [Ohio National] provided that BD [Oppenheimer] remains a broker-dealer in good standing with the NASD and other state and federal regulatory agencies and that BD remains the broker-dealer of record for the account.

6

(Selling Agreement, Doc. 1-10, #194) (emphasis added). It is easy to see why Oppenheimer starts there. At first blush, this contractual term could be read to support the notion that Ohio National must "continue [paying] compensation even after termination of the Selling Agreement, so long as such termination was not for cause." (Oppenheimer Reply Br., Doc. 35, #1071; *see also* Oppenheimer Resp. Br., Doc. 61, #1355 (arguing that the plain language of the Survival Provision states that "Ohio National may *only* cease payment of the trail commissions to Oppenheimer *if* the Agreement is terminated for cause or if Oppenheimer loses its status as a broker-dealer in good standing")).

Upon a closer look, though, things may not be so simple. The Survival Provision does not impose a freestanding obligation to pay trail commissions to the broker-dealer in the event the selling agreement is terminated without cause. Rather, it provides that "the *terms* of compensation" survive the end of the selling agreement. So, depending on what those terms are, Ohio National may or may not be on the hook for trail commissions. Where can those terms be found? The answer lies a few lines above the Survival Provision at the top of Section 9. There, the contract states that "[c]ommissions payable in connection with the Contracts shall be paid to BD, or its affiliated insurance agency, according to the Commissions Schedule(s) relating to this Agreement as they may be amended from time to time and in effect at the time the Contract Payments are received by [Ohio National]." (Selling Agreement, Doc. 1-10, #194). In other words, the "terms of compensation" are located in the commission schedules attached to the selling agreement.

7

That is where things get tricky. The relevant schedule here includes a table that specifies what commissions (as a percentage of upfront premiums and trail deposits) Oppenheimer ordinarily gets paid for selling ONCore Variable Annuities. But underneath that table are additional provisions that govern the terms of compensation. One of those terms is the In Force Provision that Ohio National relies almost exclusively on for its position. As noted above, that provision states that trail commissions:

> will continue to be paid to broker dealer of record *while the Selling Agreement remains in force* and will be paid on a particular contract until the contract is surrendered or annuitized.

(Schedules of Commissions, Doc. 1-10, #202) (emphasis added).

There's the rub. The provision that Oppenheimer relies on says that the "terms of compensation" survive, but one of those "terms of compensation" says that Ohio National will continue to pay while the selling agreement remains in force.

The combination of those two contractual terms means, at the very least, that Oppenheimer's proposed interpretation is not *necessarily* correct. Thus, Oppenheimer's request for judgment on the pleadings falls short.

But that still leaves Ohio National's argument that it is entitled to judgment on the pleadings. Ohio National asserts that the terms of the agreement—and in particular the language in the commission schedule—unambiguously mean that trail commission cease when the agreement ends. That is certainly a plausible reading of that provision. The commission schedule goes out of its way to say that trail commissions continue to be paid "while the agreement remains in force" at least

8

suggests that, if the agreement is *not* in force, then trail commissions will *not* continue to be paid. Indeed, at least one court has already held that a nearly identical provision in another agreement meant that the "obligation to pay commissions … cease[d] when the agreement terminated." *Corp. Fin., Inc. v. Principal Life Ins. Co.*, 461 F. Supp. 2d 1274, 1286 (S.D. Fla. 2006). In *Principal Life*, the relevant provision stated: "While this agreement is in force and subject to its provisions, We will pay commission to You according to the Following Commission Scales …." *Id.* at 1285. The court reasoned that the only reasonable interpretation of that provision was "that as a condition to the obligation to pay commissions, the agreement must be 'in force'; i.e.[,] not terminated." *Id.* at 1286.

Oppenheimer says that result does not follow here, and attempts to distinguish *Principal Life* in three ways. Each of those, however, misses the mark. First, Oppenheimer argues that the above-quoted provision in *Principal Life* "imposed a clear and express condition for payment, unlike here, where Ohio National's proposed interpretation arises from an inference—not an express provision." (Oppenheimer Reply Br., Doc. 35, #1075). But the In Force Provision is just as express (or not express) as the provision in *Principal Life* when it comes to answering what happens when the agreement is *not* in force. Both provisions can be reduced to an "if-then" statement: if the agreement is in force, then commissions will be paid. The difference in wording between the two provisions does not alter that basic meaning. Neither provision expressly states that if the agreement is *not* in force, then commissions will *not* be paid. They both, at best, get to that point by negative implication. Thus,

9

Oppenheimer's argument on this front does not provide a principled basis to distinguish *Principal Life*.

Oppenheimer's second crack at *Principal Life* is no more availing. Oppenheimer notes that the contract in *Principal Life* "did not include a provision that provided for the survival of compensation following termination of the agreement." (*Id.*). Here, Oppenheimer is referring to the selling agreement's Survival Provision. But as already noted, that provision simply directs the contract's reader back to the In Force Provision along with the other "terms of compensation" laid out in the relevant commission schedule. The Survival Provision does not create a freestanding obligation to pay trail commissions.

Third, and finally, Oppenheimer points out that the contract in *Principal Life* "did not contain a clause that provided commissions would be paid until the underlying contracts were surrendered or annuitized." (*Id.*). Recall that the In Force Provision states that trail commissions will continue to be paid to the broker-dealer "while the selling agreement remains in force *and will be paid on a particular contract until the contract is surrendered or annuitized.*" (Schedules of Commissions, Doc. 1-10, #202) (emphasis added). Oppenheimer argues that the Court should read the "and" in a disjunctive sense, essentially understanding the "and" as an "or." Thus, argues Oppenheimer, regardless of what the "remains in force" phrase means, Ohio National also has an independent obligation to pay trail commissions on "particular [annuity] contracts" until those particular contracts are annuitized or surrendered.

The Court is not inclined to read "and" in the disjunctive, however, for two reasons. First, the Sixth Circuit has cautioned that "and" and "or" are "not ordinarily convertible and a court is never justified in substituting one for the other, unless it is clear from the context that one has been mistakenly used for the other." *State Mut. Life Assur. Co. of Worcester v. Heine*, 141 F.2d 741, 746 (6th Cir. 1944). Oppenheimer has not made that showing here. That leads into the second reason: On the facts here, it does not make much sense why the provision would require Ohio National to continue paying on a given annuity contract through the latter of the two specified events. Imagine that a customer annuitizes or surrenders a particular contract. Would the selling agreement obligate Ohio National to continue paying under the theory that the selling agreement remains in force, which is the other part of the disjunctive condition (under Oppenheimer's reading)?

If anything, the Court sees how both the selling agreement being in force and the particular annuity not being surrendered (or annuitized) could operate in tandem as necessary conditions for the continued payment of trail commissions on a given product. The first condition deals with the agreement as a whole such that, even if particular annuities are neither surrendered nor annuitized, Oppenheimer will not collect trail commissions on them if the selling agreement as a whole is terminated. The second condition applies to particular annuities such that, even if the selling agreement as a whole remains in force, Oppenheimer will not collect trail commissions on *those* annuities if particular annuities are surrendered or annuitized. Given that the conditions do not necessarily conflict with each other—indeed, they

11

arguably complement each other—the Court is disinclined to say that, as a matter of law, the "and" must be read disjunctively in the In Force Provision. In short, Ohio National has put forth a plausible reading, supported by precedent that Oppenheimer has failed to distinguish.

But the question the Court must answer in connection with Ohio National's motion is not whether Ohio National's reading is plausible, but instead whether that reading is the *only* permissible interpretation of the selling agreement. The Court cannot make that finding here. Indeed, as Oppenheimer notes, Ohio National's proposed interpretation rests almost entirely on a logical fallacy. Specifically, Ohio National's argument appears to fall afoul of the fallacy referred to as "denying the antecedent." "Stated abstractly, it means one is wrong to assume that because a conditional premise is true, so is its inverse." *CIC Servs., LLC v. Internal Revenue Serv.*, 925 F.3d 247, 263 (6th Cir. 2019) (Nalbandian, J., dissenting) (majority reversed at 593 U.S. ___ (2021)). Stated in terms of this case, it means that the statement in the selling agreement that Ohio National *owes* trail commissions while the agreement *is* in force is not the logical equivalent of saying that Ohio National does *not owe* trail commissions while the agreement is *not* in force. The latter does not *necessarily* follow from the former.

At the end of the day, both proposed interpretations have some potential shortcomings. For example, as noted, Ohio National's proposed interpretation rests entirely on a logical fallacy. At the same time, though, ordinary human communication does not always (or even usually) adhere to the dictates of formal

logic, and neither does contractual language. That is why courts in Ohio (and elsewhere) are instructed to read the words in a contract in their "plain, common and ordinary sense." *Olmstead v. Lumbermens Mut. Ins. Co.*, 259 N.E.2d 123, 126 (Ohio 1970). And ordinary sense sometimes demands inferring that because a conditional premise is true, then so is its inverse. Consider the hypothetical homeowner who says to someone: "if you paint my house, I will pay you $500." Does the homeowner really have to say that "if you *don't* paint my house, I *won't* pay you $500" to make that point clear? The Court thinks not. Ohio National says it is merely making that same point here. And, to be fair, at least one court has already adopted Ohio National's position. Thus, the Court rejects the idea that Oppenheimer's identification of this logical fallacy gets it all the way home.

Oppenheimer further argues that Ohio National's position produces an absurd interpretation (and so should be avoided) because it would mean that Oppenheimer agreed to a deal in which Ohio National could avoid paying trail commissions by terminating a selling agreement for any reason (or no reason at all). That argument gives the Court some pause, especially as Ohio National does not deny that the selling agreement lets it do that. To be sure, Ohio National counters that the result is not as absurd as Oppenheimer suggests. According to Ohio National, the arrangement reflects "a potential result of the parties' bargained-for terms and allocation of risk." (Ohio National Reply, Doc. 62, #1377) (emphasis added). But the Court finds little comfort in this rather equivocal and conclusory explanation.

13

That being said, it is not as though Oppenheimer walks away empty handed upon a without-cause termination. As Ohio National notes elsewhere, at least one type of financial product governed by the same selling agreement does not have the same "in force" limitation in its commission schedule as does ONCore Variable Annuities. And even with respect to the ONCore Variable Annuities, the "in force" limitation does not apply to up-front (i.e., non-trail) commissions. So perhaps Ohio National is right that further factual development will show that the limitation on the trail commissions reflects some type of bargained-for compromise. In that case, Oppenheimer's absurdity argument would appear to be a non-starter; the Ohio Supreme Court has limited the use of this construction to situations involving "*ridiculously* unreasonable" results. *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 150 N.E.3d 28, 33 (Ohio 2019) (emphasis original).

But all the above just explains why the Court does not think that the contract *unambiguously* means what either party says it means. Both sides have identified some strong (and some not-so-strong) arguments in support of their respective positions. And that is probably about what one would expect when, as the Court finds here, the contract is ambiguous on the point at issue. Thus, neither party is entitled to judgment as a matter of law.

One final observation. Oppenheimer is not the only broker-dealer to whom Ohio National stopped paying trail commissions after terminating the relevant selling agreement. And this is not the only lawsuit addressing that issue. Indeed, from what the Court can tell, similar disputes between Ohio National and other

broker-dealers have spawned lawsuits in several different parts of the country. Perhaps not surprisingly, this is not the first time that a court has been called upon to analyze the meaning and relationship of the two provisions at issue here—the Survival Provision and the In-Force Provisions. In fact, at least two other courts have addressed the same issue—one in this District and one outside. *See Veritas Indep. Partners, LLC v. Ohio Nat'l Life Ins. Co.*, No. 1:18-cv-769, 2019 U.S. Dist. LEXIS 172066, at *1 (S.D. Ohio Oct. 2, 2019); *Kestra Inv. Servs., LLC v. Ohio Nat'l Life Ins. Co.*, No. A-19-CV-00687-JRN, 2019 U.S. Dist. LEXIS 226144, at *6 (W.D. Tex. Nov. 19, 2019). Although the postures of both cases (summary judgment) were different from this one, the issue was the same. And the only evidence the courts referred to in both cases were the relevant selling agreements, which featured provisions identical to the Survival Provision and the In Force Provision at issue here. The broker-dealers in those cases argued, like Oppenheimer does here, that the Survival Provisions meant that the contracts unambiguously guaranteed them trail commissions on certain annuities, even after Ohio National had terminated the relevant selling agreements (without cause). And Ohio National argued in those cases, as it does here, that the In Force Provisions unambiguously relieved it of any obligation to pay trail commissions, even though it terminated the selling agreements without cause. In both cases, the courts denied summary judgment and held that the contract was ambiguous with respect to the issue. This Court's independent examination of the issue leads it to the same conclusion here.

## CONCLUSION

For the reasons below, the Court **DENIES** Oppenheimer's Motion for Judgment on the Pleadings (Doc. 25); **DENIES AS MOOT** Ohio National's Motion for Judgment on the Pleadings (Doc. 37); and **DENIES** Ohio National's Amended Motion for Judgment on the Pleadings (Doc. 59).

    **SO ORDERED.**

July 7, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**